IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | | |
|---|---|---|
| **HELEN RHODES,** | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:10-CV-0784-BF |
| | § | |
| **MICHAEL J. ASTRUE,** | § | |
| **Commissioner of the Social** | § | |
| **Security Administration,** | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

This is a consent case before the United States Magistrate Judge. Helen Rhodes ("Plaintiff") appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") to deny Supplemental Security Income ("SSI") under Title XVI of the Social Security Act (the "Act"). The Court has considered Plaintiff's Brief, filed September 10, 2010, Defendant's Brief, filed October 10, 2010, and Plaintiff's Reply Brief, filed October 22, 2010. The Court has reviewed the parties' evidence in connection with the pleadings and hereby orders that the Commissioner's decision be REVERSED and REMANDED for further administrative proceedings.

### I. BACKGROUND[1]

*A.    Procedural History*

Plaintiff filed an application for SSI on April 7, 2004, alleging a disability onset date of June 9, 2003. (Tr. 30.) Her claims were denied both initially and upon reconsideration. (Tr. 41-44; 48-50.) Plaintiff timely requested a hearing, and a hearing was held on March 21, 2006 before Administrative Law Judge ("ALJ") Ward D. King. (Tr. 52; 474-90.) On April 27, 2006, the ALJ issued a decision finding Plaintiff not disabled, and Plaintiff requested review by the Appeals Council. (Tr. 5; 27-38.) Plaintiff submitted additional evidence

---

[1]The following history comes from the transcript of the administrative proceedings, which is designated as "Tr."

1

to the Appeals Council, and the Appeals Council denied review on March 11, 2010. (Tr. 5.) Plaintiff filed this action on April 19, 2010, seeking judicial review of the administrative proceedings pursuant to 42 U.S.C. § 405(g). (Doc. 1.)

On June 15, 2010, the Commissioner moved to remand the case pursuant to sentence six of § 405(g) because the Social Security Administration could not locate the recording of the March 21, 2006 administrative hearing. (Doc. 5.) On June 25, 2010, the District Court granted the motion in part and denied it in part. (Doc. 10.) The Commissioner was ordered to produce, within 120 days, the transcript of the records and move to reopen the case or to hold a new hearing, transcribe it, and move to reopen the case. (Doc. 10.) On July 23, 2010, the Commissioner moved to reopen the case after locating and transcribing the hearing recording. (Doc. 10.) The District Court reopened the case on the same day. (Doc. 12.) This matter is ripe for consideration on the merits.

   **B.**     *Factual History*

   1.     Plaintiff's Age, Education, and Work Experience

Plaintiff was born on December 26, 1959 and was a younger person under the Act at all times relevant to her claim. (Tr. 37.) Plaintiff did not finish high school but later obtained a general equivalency diploma ("GED"). (Tr. 219; 476.) She attended college but did not earn a degree. (Tr. 219.) Plaintiff received LVN, licensed vocational nurse, training while in the military and worked as an LVN for five years prior to her decline in health. (Tr. 219; 476.)

   2.     Plaintiff's Medical Evidence

In 1993, while in the military, Rhodes suffered an injury to her foot. (Tr. 298.) As a result, Rhodes' right leg was placed in a cast up to her knee. (Tr. 298.) Shortly after the cast was removed, Rhodes began to experience swelling in her right leg along with aching, burning pain. (Tr. 329.) The chronic pain in Rhodes' leg was diagnosed as reflex sympathetic dystrophy ("RSD"). (Tr. 329.) Though Rhodes noticed no improvement in her symptoms for several years thereafter, she began to see improvement sometime in 1998.

(Tr. 298.) However, after taking another fall in 2003, Rhodes' chronic pain returned.

On April 15, 2003, Rhodes visited her primary care provider Dr. Gregory J. Phillips, M.D. ("Dr. Phillips"). Dr. Phillips noted Rhodes' long history of medical problems since developing RSD in the military. (Tr. 159.) Dr. Phillips then found that Rhodes had been having trouble with muscle weakness for the past several months. (Tr. 159.) The weakness was such that Rhodes' physician employer noticed a significant decline in her functional abilities. (Tr. 159.) Dr. Phillips decided a referral to a neurologist would best address Rhodes' issues with muscle weakness and help with pain management. (Tr. 159.) Upon that assessment, Dr. Phillips referred Rhodes to Dr. J.P. Liu., M.D. ("Dr. Liu"). (Tr. 158.)

Rhodes first visited Dr. Liu on June 4, 2003. (Tr. 207.) Dr. Liu noted Rhodes' past history of RSD and depression, then went on to investigate possible causes of her generalized weakness and muscle spasms. (Tr. 207.) Dr. Liu found that Rhodes' symptoms which included episodes of body spasms, right-side weakness, balance problems, double vision and constant fatigue could stem from multiple sclerosis ("MS"), vasculitis, RSD, or sarcoidosis. (Tr. 207-08.) Upon further testing, Dr. Liu added cervical spine abnormality and focal seizure activity to the list of possible causes of Rhodes' symptoms. (Tr. 197.) After more testing, possible causes of Rhodes' neurological problems were narrowed to MS, vasculitis, RSD, or pschogenic causes. (Tr. 183.) Dr. Liu then determined that a second neurological opinion would be required. (Tr. 181.) Dr. Liu referred Rhodes to Dr. Lincoln Chin, M.D. ("Dr. Chin"). (Tr. 179.)

On December 5, 2003, Dr. Chin found Rhodes' most recent episodes were severe. (Tr. 176.) Specifically, in June 2003, Rhodes began to have intermittent head tremors which progressively worsened to a constant side to side tremor. (Tr. 176.) She also experienced jerking of her legs, which on one occasion was so severe that she bit her tongue in three places. (Tr. 176.) At times, the jerking would even continue when Rhodes was in bed at night. (Tr. 176.) Additionally, Rhodes experienced intermittent muscle pain and fluid retention in her arms and legs, low grade fevers, and decreased mental agility. (Tr. 176.) Rhodes also reported persistent fatigue that had gotten worse over time. (Tr. 176.) Dr. Chin observed that Rhodes had a

3

very bizarre tremor with some give way weakness and numbness and anatomical sensory loss on her right side. (Tr. 178.) Like Dr. Liu, Dr. Chin opined that the cause might be a psychogenic disorder. (Tr. 178.)

On December 10, 2003, Rhodes returned to Dr. Liu for a check-up. On her return, Rhodes still reported right-sided weakness, muscle spasms and her whole body shaking, but more so her head shaking. (Tr. 175.) At subsequent visits Rhodes' symptoms got progressively worse. (Tr. 166-73.) In addition to her previous complaints, Rhodes reported episodes where she could not move, tightness of her skin, and swelling in her legs and feet. (Tr. 173.)

Given that Rhodes' symptoms were not improving, Dr. Liu referred her to The Eugene McDermott Center for Pain Management ("McDermott Center"). (Tr. 171.) The McDermott Center was to develop a treatment plan that would allow Rhodes to cope with her pain. (Tr. 171.) However, Rhodes was unable to obtain treatment at the McDermott Center, at which time Dr. Liu saw fit to obtain a third opinion from yet another neurologist. (Tr. 170.)

The third neurologist was Dr. Bill Gulledge, M.D. ("Dr. Gulledge"). (Tr. 214.) By the time Rhodes saw Dr. Gulledge in March 2004, she was in a wheelchair and unable to drive due to her illness. (Tr. 214.) After evaluating Rhodes, Dr. Gulledge got the impression that there was "something very wrong with [Rhodes] that is not physical." (Tr. 214.) During his evaluation, Rhodes sat in her wheelchair twisting and jerking, shaking her extremities, but upon distraction it all subsided. (Tr. 214.) His evaluation also revealed the same right-side weakness that Rhodes suffered from at the onset of her illness. (Tr. 215.) Then, much like the other neurologists Rhodes saw, Dr. Gulledge also questioned the physicality of her disorder. (Tr. 215.) After the evaluation was complete, Dr. Gulledge recommended Rhodes see a doctor in an academic setting at the movement disorder clinic in Dallas. (Tr. 215.) Additionally, he noted that he was unaware of a neurological syndrome that manifests itself in symptoms like those of Rhodes. (Tr. 215.)

Rhodes noticed some improvement in her symptoms in June 2004. (Tr. 166.) She visited Dr. Liu on June 23, 2004, and reported that one of her prescriptions, Neurontin, had helped her. (Tr. 166.) Despite her

4

good report, Rhodes requested that Dr. Liu increase the Neurontin dosage because she still had frequent pain due to her RSD. (Tr. 166.) Dr. Liu granted her request by increasing the dosage from 900 mg. twice per day to 900 mg. three times per day. (Tr. 166.)

Rhodes also went in for a consultative psychological evaluation with Carol R. Wadsworth, Ph.D. ("Wadsworth") that month. (Tr. 217-20.) At her meeting with Wadsworth, Rhodes was still wheelchair bound and reported the same medical issues as she had previously. (Tr. 217.) In addition, she reported taking Zoloft for posttraumatic stress disorder ("PTSD") and being depressed most days of the week due to her physical problems. (Tr. 217.) Rhodes also reported memory problems that started about a year prior to her visit with Wadsworth. (Tr. 217.) In relation to her memory problems, Rhodes recalled episodes of losing things and doing things that she could not remember. (Tr. 217.)

Rhodes also discussed her personal history with Wadsworth. (Tr. 218.) She was raised by her mother but never knew her biological father. (Tr. 218.) As a child she recalled being left alone with stepfathers because her mother worked a lot. (Tr. 218.) She said her stepfathers were alcoholics. (Tr. 218.) Then went on to say that she was verbally abused by three of her stepfathers and one abused her physically and sexually from the age of six until she left home at the age of thirteen. (Tr. 218.) When she left home she quit school but later obtained a GED. (Tr. 219.) She attended college but did not earn a degree. (Tr. 219.)

Next, Rhodes said that prior to her decline in health she worked as a LVN nurse for five years at an internal medicine clinic. (Tr. 219.) She was forced to leave because her employer saw her as a health risk due to her poor balance and inability to give shots. (Tr. 219.) After evaluating Rhodes, Wadsworth concluded that Rhodes suffered from major depressive disorder, attention deficit hyperactivity disorder and some remaining symptoms of PTSD. (Tr. 219.) She also assessed a Global Assessment of Functioning ("GAF") score of 60.[2]

---

[2] A GAF score represents a clinician's judgment of an individual's overall level of functioning. *See* American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed. Text rev. 2000) (DSM). A GAF of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

5

(Tr. 219.)

Rhodes saw a fourth neurologist, Dr. Simon Tan ("Dr. Tan"), on March 28, 2005. (Tr. 260.) By the time she saw Dr. Tan, Rhodes was on several medications to help her cope with her illness. (Tr. 260.) A few worth noting are 900 mg. of Gabapentin taken twice daily, 500 mg. of Hydrocodone taken three times daily, Morphine, and Clonazepam. (Tr. 260.) After evaluating Rhodes, Dr. Tan echoed the opinion of the doctors Rhodes saw previously. (Tr. 263.) More specifially, he opined that she might have a psychosomatic disorder but ruled out seizure disorder and noted other possible causes of her disorder. (Tr. 263.) When Rhodes saw Dr. Tan again on August 15, 2005, his opinion was unchanged. (Tr. 271.)

On August 19, 2005, Rhodes was prescribed a wheelchair by the Department of Veteran's Affairs Medical Center. (Tr. 304.) Then in April 2006, Rhodes' mental state significantly declined. (Tr. 399.) On April 14, 2006, she was admitted to a Partial Hospitalization Program at Huguley Memorial Medical Center ("Huguley Memorial") for major depression. (Tr. 399.) Upon admission she began group therapy. (Tr. 386.) As part of her therapy Rhodes' mental state was evaluated daily. (Tr. 392-97; 419-21.) After being discharged, Rhodes was instructed to attend aftercare meetings once a week. (Tr. 425.)

At her initial aftercare meeting with Marvin Burns, LPC, LMFT ("Burns"), Rhodes expressed that she had constant tension and nervousness and felt worthless, lonely, weak and hopeless. (Tr. 469.) Burns observed that she was experiencing some degree of despair and that she appeared unable to cope with employment due to her physical and emotional impairment. (Tr. 469.). He assessed a GAF of 52. (Tr. 469.) At a subsequent meeting, Rhodes expressed feeling very despondent over not having the ability to go anywhere, not getting approval for an electric wheelchair or scooter, and not being able to drive. (Tr. 458.) At meetings that followed, Rhodes echoed these expressions. (Tr. 456-57.) Her most recent GAF was 40.[3] (Tr. 456.)

---

[3] A GAF of 31-40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. DSM at 34.

6

3.     Plaintiff's Hearing

Plaintiff appeared at the hearing with a representative and testified. (Tr. 475.) She testified that she has a high school education and received LVN training in the military. (Tr. 476.) She has no other job related training or skills. (Tr. 476.) She left active duty in the military in 1993 and worked as an LVN in a clinic after that. (Tr. 477.) She last worked in June 2003. (Tr. 477.)

She stopped working because she was having problems with stability, thinking, and shaking. (Tr. 478.) She has short-term memory problems and has been diagnosed with depression, anxiety, and PTSD. (Tr. 478.) Her depression and anxiety has not gotten any better since she stopped working. (Tr. 478.) She also has a lot of pain, mostly in her right side, and is only able to walk for short periods of time using a walker. (Tr. 479.) She mostly uses a wheelchair and has to be pushed due to pain in her right arm. (Tr. 479.)

Plaintiff stated that she is always in pain, but she can sit for about thirty to forty minutes before the pain becomes excruciating. (Tr. 479.) She has to take a two hour nap each day, otherwise she becomes very shaky and tired. (Tr. 479.) Her husband does the cooking, grocery shopping, and laundry. (Tr. 480.) She testified that if she is having a good day, she may try to do a little cleaning. (Tr. 480.) Plaintiff has about two good days each week. (Tr. 480.) On bad days, she shakes a lot, has short-term memory problems, and needs help washing her hair and getting dressed. (Tr. 480-81.) On those days, she does pretty well just lying down. (Tr. 481.) Plaintiff also stated that she is no longer able to type. (Tr. 481.)

Plaintiff testified that some of her medications cause drowsiness, but she tries to take those at night only. (Tr. 482.) When she reads, she is unable to remember what she read four or five pages ago. (Tr. 483.) She also has trouble finishing tasks and gets side tracked easily. (Tr. 483.)

Plaintiff stated she was diagnosed with PTSD two years prior to the hearing and has a disability rating of 30% through the VA. (Tr. 483.) The VA rating was completed in 2003, and she has the paperwork at home to have the rating re-evaluated but has not submitted it yet. (Tr. 483.) She testified that her wheelchair is prescribed. (Tr. 485.)

Plaintiff's husband, Mr. Rhodes, testified that Plaintiff is unable to do any of the things she used to

do. (Tr. 485.) He does the bills, grocery shopping, cooking, and cleaning. (Tr. 485.) Plaintiff wakes him up at night because she moans in her sleep and has nightmares. (Tr. 485.) He stated she is unable to do any tasks without assistance and either her mother and father or a friend from church takes her to her doctor appointments. (Tr. 486.)

A vocational expert ("VE") testified that a younger individual with Plaintiff's education and work background who can perform a full range of work, except that individual is limited to jobs with a reasoning developmental level of one through three and no more than superficial public contact, can not perform Plaintiff's past relevant work. (Tr. 487.) However, that same individual could perform the unskilled jobs of office helper, cleaner, and laundry worker. (Tr. 488.) The VE further testified that if the individual was unable to sit for more than one hour in an eight-hour workday, she could still perform these jobs. (Tr. 488-89.) If the individual could not stand or walk for more than one hour per day, she would not be able to work. (Tr. 489.) Furthermore, if the individual could not bend, crawl, or squat, she would not be able to work at the previously named jobs. (Tr. 489.)

### C. ALJ's Findings

In his decision, the ALJ followed the five step sequential disability analysis found in 20 C.F.R. § 416.920(a). At step one, the ALJ determined Rhodes has not engaged in substantial gainful activity at any time relevant to her claim. (Tr. 31.) At step two, he found Rhodes to have the following "severe" impairments: major depressive disorder, PTSD, and somatization disorder, not otherwise specified. (Tr. 31.) At step three, the ALJ found Rhodes did not have an impairment or combination of impairments that meets or medically equals one of the impairments listed in Appendix 1 of the Regulations. (Tr. 31.) More specifially, although the ALJ considered Rhodes' mental impairments to be severe, he found they did not meet the "C" criteria of any applicable mental impairment. (Tr. 36.) Next, the ALJ found Rhodes' allegations concerning her level of pain, subjective complaints, and functional limitation were not credible or reasonably supported by objective medical evidence. (Tr. 34.) The ALJ then determined that Rhodes had the RFC to "obtain, perform, and maintain the exertional and nonexertional requirements of work-related activities on

a consistent, sustained basis, except she must perform jobs with a reasoning development level of one, two, or three . . . and she must have no more than superficial contact with the public." (Tr. 36.) At step four, the ALJ determined Rhodes could not return to her past relevant work. (Tr. 36.) At step 5, the ALJ found Rhodes is able to perform other work in the national economy. (Tr. 37.) Accordingly, the ALJ concluded that Rhodes was not disabled within the meaning of the Act at any time through the date of the his decision. (Tr. 38.)

## II. STANDARD OF REVIEW

A claimant must prove that she is disabled for purposes of the Act to be entitled to social security benefits. *Leggett v. Chater*, 67 F.3d 558, 563-64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Act is "the inability to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled. Those steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. §404.1520(b)-(f)). Under the first four steps of the inquiry, the burden lies with the claimant to prove her disability. *Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the

claimant is disabled or is not disabled. *Id*. Once the claimant satisfies her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the Regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits is supported by substantial evidence and to whether the proper legal standard was utilized. *Greenspan*, 38 F.3d at 236; 42 U.S.C.A. §405(g). Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not re-weigh the evidence, retry the issues, or substitute its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.

Having reviewed the applicable legal standards, the Court now turns to the merits of the case.

### III. ANALYSIS

Plaintiff argues: (1) the ALJ failed to consider properly Plaintiff's somatization disorder in his step 3, treating source, credibility, and RFC findings; and (2) the Appeals Council's failure to accord proper weight to the new evidence from Rhodes' treating physicians prejudiced her claim.

#### A. *Consideration of Somatization Disorder*

The Social Security Administration defines somatoform disorder as "physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms." 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.07. The defining characteristic of somatization disorders is the manifestation of physical symptoms without determinable physiologic causes. *See Scott v. Shalala*, 43 F.3d 669, No. 94-50096, 1994 WL 725034, at *4 (5th Cir. Dec. 19, 1994). Notably, despite the lack of physical evidence, "there is nothing imaginary or simulated about the patient's perception of his or her illness." EDWARD SHORTER, FROM

10

PARALYSIS TO FATIGUE: A HISTORY OF PSYCHOSOMATIC ILLNESS IN THE MODERN ERA ix (Free Press 1992). In fact, although "the multiple somatic complaints cannot be fully explained by any known general medical condition or the direct effects of a substance. . . . the unexplained symptoms in Somatization Disorder are not intentionally feigned or produced." DSM at 486. In the present case, the ALJ found Rhodes' somatization disorder to be part of a "severe" combination of impairments. (Tr. 31.)

At step three, the ALJ must identify every Listing that could apply to the claimant. *Bentley v. Comm'r of the Soc. Sec. Admin.*, 3:10-CV-0032-L, 2011 WL 903455, at *10 (N.D. Tex. Feb. 24, 2011) (citing *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007)). However, in this case, the ALJ merely stated that Plaintiff "does not have any impairment or combination of impairments listed in, or that equals in severity an impairment listed in . . . Appendix 1" and failed to identify the listed impairment for which Plaintiff's symptoms failed to qualify. The ALJ also failed to provide an explanation as to how he reached the step 3 conclusion. The Court finds that the ALJ's failure to specifically identify the relevant Listings and provide an explanation of the step 3 decision was legal error. However, reversal is appropriate only where the error results in prejudice to the claimant. *See Ripley v. Charter*, 67 F.3d 552, 557 (5th Cir. 1995). For the following reason, the Court finds that had the ALJ provided an evaluation of Listing 12.07, somatoform disorder, he would have reached the same conclusion.

The Listing for somatoform disorder requires the claimant to meet the conditions in both part A and part B as follows:

A. Medically documented by evidence of one of the following:

    1. A history of multiple physical symptoms of several years duration, beginning before age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly; or

    2. Persistent nonorganic disturbance of one of the following:

        a. Vision; or
        b. Speech; or
        c. Hearing; or
        d. Use of a limb; or
        e. Movement and its control (e.g., coordination disturbance, psychogenic seizures,

>>akinesia, dyskinesia); or
>>f. Sensation (e.g., diminished or heightened); or

>3. Unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury;

>B. Resulting in at least two of the following:

>>1. Marked restriction of activities of daily living; or

>>2. Marked difficulties in maintaining social functioning; or

>>3. Marked difficulties in maintaining concentration, persistence, or pace; or

>>4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Part 404, Subpt. P, App. 1, § 12.07. Although, the ALJ did not provide a discussion of Listing 12.07, he did provide a detailed discussion of the "C" criteria for the applicable mental impairments under 20 C.F.R. § 404.1520a. This discussion, although technically specific to the ALJ's RFC determination, mirrors the criteria found in Part B of Listing 12.07.

In evaluating whether Plaintiff's mental impairments meet the C criteria, the ALJ determined that Plaintiff only has mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and moderate deficiencies of concentration, persistence, or pace. (Tr. 36.) He further found that Plaintiff's mental impairment has not resulted in any episodes of decompensation. (Tr. 36.) Therefore, had the ALJ evaluated Plaintiff's somatoform disorder in step 3, he would have determined that Plaintiff does not meet Part B of Listing 12.07.

The Court must next determine whether the ALJ's step 3 determination is supported by substantial evidence. Because the Court has equated the ALJ's C criteria evaluation with the step 3 determination, the Court will analyze the C criteria determination for substantial evidence.

The ALJ's determination that Plaintiff did not meet the C criteria was based heavily on his findings that Plaintiff's treating sources were not supported by the objective medical evidence and that Plaintiff's subjective complaints were not credible. He states:

>In this case, there is no objective evidence of any medically determinable physical impairment that

> results in exertional limitations. Despite Ms. Rhodes' multiple somatic complaints, her physical examinations and her neurological examinations have been fairly unremarkable, and all her diagnostic studies have been essentially normal. The record is replete with reference to Ms. Rhodes' psychosomatic disorder, giveaway weakness, and non-rhythmic tremor, and Dr. Guzman has diagnosed somatoform disorder, which is consistent with the findings of the neurologists. Given the lack of objective findings and the repeated references to psychosomatic symptoms, Ms. Rhodes' subjective complaints of physical symptoms lack credibility (Tr. 35);

and

> In this case, the physicians who have assessed Ms. Rhodes at a less than sedentary level of exertion, apparently based on the claimant's subjective reports, also have failed to find any objective evidence to support her subjective complaints. As such, their opinions are not supported by their treating records specifically or the record generally. Hence I have afforded those assessments little weight (Tr. 35-36).[4]

The ALJ's findings regarding treating source opinions and Plaintiff's credibility show an utter disregard or lack of understanding of the nature of a somatization disorder. The lack of objective medical evidence is the defining characteristic of the condition. The Social Security Administration defines somatoform disorder as "physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms." 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.07. Therefore, the reasons the ALJ uses to dismiss both Rhodes' allegations and the treating source opinions are, in fact, the very basis for her repeated diagnoses of somatization, conversion, psychogenic, and psychosomatic disorders. The Court finds that the ALJ's decision to discount treating source opinions and Plaintiff's subjective complaints is not supported by substantial evidence and that, therefore, the ALJ's step 3 decision is not supported by substantial evidence.

The Court is mindful that Plaintiff filed her initial application in April 2004 and that, for unexplained reasons, the Commissioner did not issue a final decision until March 2010, almost six years later. It is also noted that this Court's review was further delayed by the Social Security Administration's inability to locate the recording of the administrative hearing. The Court sympathizes with Plaintiff's situation and what must

---

[4] The ALJ, as a reason to discount Dr. Guzman's opinion, also states, "Dr. Guzman is well known to me, and his opinions typically are not supported by the credible medical evidence." (Tr. 36.) The Court cannot help but note how inappropriate it is for an ALJ to base any part of his decision on a doctor's opinion from a case that is wholly unrelated to the one at issue.

certainly have been a frustrating seven years. However, the Court does not have the authority to weigh the evidence in the record and substitute its own opinion for that of the Commissioner. Therefore, the Court finds the case should be reversed and remanded for further administrative proceedings. Taking into account the extreme delay in Ms. Rhodes' case, the Court believes the Commissioner should have no longer than 120 days to issue a final decision on remand. The Court also has some concerns, after review of this particular record, as to whether or not the previous presiding ALJ will evaluate Ms. Rhodes' application fairly upon remand and, therefore, suggests the Social Security Administration consider assigning the case to a different ALJ.

### B. *New Evidence Submitted to the Appeals Council*

Because the Court has determined the case should be remanded at step 3 of the ALJ's decision, the Court does not reach the Plaintiff's remaining argument.

### III. CONCLUSION

The Court finds that the ALJ's decision is not supported by substantial evidence. Accordingly, the case is REVERSED and REMANDED for further consideration in line with this opinion. It is further ordered that the Commissioner be given no more than 120 days to issue a final decision in this matter.

SO ORDERED, August 26, 2011.

_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

14